**In The United States District Court**
**For The Southern District of Iowa**

| | |
|---|---|
| **ANIMAL LEGAL DEFENSE FUND**; **PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.**; **BAILING OUT BENJI**; **FOOD & WATER WATCH**; and **IOWA CITIZENS FOR COMMUNITY IMPROVEMENT** | |
| *Plaintiffs*, | Case No.: _____ |
| v. | **CIVIL RIGHTS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **KIM REYNOLDS**, in her official capacity as Governor of Iowa, **TOM MILLER**, in his official capacity as Attorney General of Iowa, **VANESSA STRAZDAS**, in her official capacity as Cass County Attorney, **CHUCK SINNARD**, in his official capacity as Dallas County Attorney, and **JOHN GISH,** in his official capacity as Washington County Attorney | |
| *Defendants*. | |

I.     SUMMARY

1.      The provisions of Iowa House File 775 (2021) codified at Iowa Code § 727.8A represent yet another blatant effort by the Iowa legislature to protect industrial animal agricultural operations through suppressing free speech.[1]

2.      Iowa has already enacted at least two "Ag-Gag" laws that have been held unenforceable. Ag-Gag laws target investigations, particularly of factory farms and slaughterhouses, thereby suppressing true information about the illegal and unethical activities that occur in such facilities from reaching the public and policy makers and pressing for change.

_____

[1] In this action, Plaintiffs are not challenging a separate statute that was also enacted as part of House File 775, which is codified at Iowa Code § 716.7A.

1

Indeed, without exception, each of the more than eighty such investigations that have been conducted over the last decade by journalists and animal protection advocates has exposed horrific animal suffering and many have led to food safety recalls, citations for environmental and labor violations, evidence of health code violations, criminal cruelty to animals convictions, and civil litigation. Similar investigations have also been used to document cruelty to animals and neglect at facilities such as puppy mills, animal auctions, and roadside zoos.

3.      The investigations typically operate through an investigator documenting day-to-day activities at the facility using a hidden video camera worn either while posing as a customer or while performing their job functions for the owner or operator. The photos or videos are then used in media, complaints to law enforcement and regulatory bodies, litigation, policy advocacy, and the like, becoming an important part of the national conversation on significant matters of public concern. Indeed, investigations like this date back to Upton Sinclair's work to produce *The Jungle*, which brought about the enactment of our country's first food safety laws, the Federal Meat Inspection Act and the Pure Food and Drug Act. A 2015 study conducted by Purdue University found that more consumers rely on animal and environmental organizations as their primary source of information about animal welfare on farms, than rely on industry groups and government, combined, for this information.

4.      Because it targeted the steps to engage in this socially important speech, Iowa's first Ag-Gag law was enjoined as violating the First Amendment. *Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812 (S.D. Iowa 2019), *appeal filed*, No. 19-1364 (8th Cir. Feb. 22, 2019); *Animal Legal Def. Fund v. Reynolds*, No. 4:17-cv-00362, 2019 WL 1493717 (S.D. Iowa Feb. 14, 2019).

5.     Immediately thereafter, Iowa enacted its second Ag-Gag law targeting other activities in which Plaintiffs in the first case—who are also Plaintiffs here—explained they would engage if the first law was enjoined.

6.     Those same Plaintiffs challenged that second Ag-Gag law, and it too was enjoined because it likely violated the First Amendment. *Animal Legal Def. Fund v. Reynolds*, No. 4:19-cv-00124, 2019 WL 8301668 (S.D. Iowa Dec. 2, 2019).

7.     These decisions are consistent with judgments invalidating Ag-Gag laws in numerous other jurisdictions. *See, e.g.*, *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018); *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193 (D. Utah 2017); *Animal Legal Def. Fund v. Kelly*, 434 F. Supp. 3d 974 (D. Kan. 2020), *amended*, No. CV 18-2657-KHV, 2020 WL 1659855 (D. Kan. Apr. 3, 2020), *appeal filed*, No. 20-3082 (10th Cir. May 1, 2020).

8.     Undeterred, Iowa has now enacted this new law, Iowa Code § 727.8A, that also targets Plaintiffs' speech.

9.     Iowa Code § 727.8A creates a new crime for a person who (i) "commit[s] a trespass as defined in section 716.7" and (ii) "knowingly places or uses a camera or electronic surveillance device that transmits or records images or data while the device is on the trespassed property."

10.    A first offense is an "aggravated misdemeanor," which is punishable by up to two years in jail and a fine of between $855 and $8,540; this is a punishment far more severe than the punishment for trespass, where the first offense is a "simple misdemeanor," which is typically punishable by up to 30 days in jail and a fine of $105 to $855, Iowa Code §§ 716.8, 903.1. In fact, a person who "knowingly trespasses" with "the intent to commit a hate crime" is only guilty of a "serious misdemeanor," which is also less than an "aggravated misdemeanor." Iowa Code § 716.8(3).

11.     In other words, Iowa has created a unique crime to provide special, severe deterrents for activities that form the basis of Plaintiffs' advocacy.

12.     Iowa did so by making engaging in speech one of the elements of this new crime.

13.     Recording is First Amendment-protected speech. *I.e. Wasden*, 878 F.3d at 1203-04; *S.H.A.R.K. v. Metro Parks Serving Summit Cnty*, 499 F.3d 553, 561-62 (6th Cir. 2007); *Kelly*, 434 F. Supp.3d at 999; *People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F. Supp. 3d 547, 566-67 (M.D.N.C. 2020), *appeal filed*, No. 20-1776 (L) (4th Cir. July 10, 2020); *Herbert*, 263 F. Supp. 3d at 1206-09.

14.     Like other Ag-Gag laws passed after courts rejected early attempts to suppress advocacy-groups' investigations, Iowa Code § 727.8A seeks to create the gloss of legitimacy by applying to industries beyond agriculture, so that the State can claim its aim is not just to prevent pro-animal speech. And it targets speech alongside other activities, so that the State can claim its real aim is to prohibit conduct, not speech.

15.     Numerous courts have rejected this gambit of passing broader laws that target speech and conduct in order to accomplish the same goals as earlier Ag-Gag laws, recognizing it as the thin cover-up it is. *W. Watersheds Project v. Michael*, 869 F.3d 1189 (10th Cir. 2017); *People for the Ethical Treatment of Animals*, 466 F. Supp. 3d 547; *W. Watersheds Project v. Michael*, 353 F. Supp. 3d 1176 (D. Wyo. 2018).

16.     Making Iowa Code § 727.8A not just constitutionally suspect, but patently unconstitutional, the State offered no justification for the law's speech restriction.

17.     The legislature did not suggest any pattern of recordings following trespasses that it needed to regulate.

18.     It also did not explain why existing laws prohibiting the invasion of privacy would not address any recordings of concern. *See, e.g.*, *Koeppel v. Speirs*, 808 N.W.2d 177, 180-81 (Iowa 2011). In fact, in addition to common law protections, Iowa already has a statute—which Plaintiffs are not challenging—that makes it an aggravated misdemeanor to record a person in compromising circumstances. Iowa Code § 709.21. It has yet another statute—which Plaintiffs are not challenging—that makes it a serious misdemeanor to photograph or film another person through the windows of their home without their consent. Iowa Code §§ 716.7(2)(a)(7), 716.8(7).

19.     Iowa Code § 727.8A is not targeted to similar concerns. Instead, it prohibits recording in places where there is no expectation of privacy. A trespass can occur in any place where a person can be denied access. As discussed more below, members of Plaintiff Iowa Citizens for Community Improvement have been arrested for trespass while standing in open areas of legislators' offices, parts of businesses in which other customers regularly come and go, and construction zones open to public view and regularly traversed by workers and subcontractors. Iowa Code § 727.8A criminalizes recording that advocacy.

20.     Iowa Code § 727.8A could also be used to punish reporters who access railroad tracks or public utilities and document an accident, *see* Iowa Code § 716.7(2)(a)(5)-(6) (making entering or remaining on rail property or at a public utility without permission a trespass); people who use their phones to take a video of their discriminatory denial of access to a business, *id.* § 716.7(2)(a)(2) (making remaining on business property after being asked to leave a trespass); and workers who use a phone or camera to gather proof of unsafe conditions or managers' derogatory comments, *id.* § 716.7(2)(a)(4) (making using an object at businesses without permission a trespass).

21.     Senator Brown, the Floor Manager for the bill, asserted that Iowa Code § 727.8A would protect against "industrial espionage" and "trade secret" theft.[2] However, he failed to point to a single example of espionage or theft that motivated the law. Further, Iowa has already enacted the Uniform Trade Secrets Act, which is designed to protect against these precise harms. *See* Iowa Code § 550.1 *et seq.* Senator Brown also did not explain why, if the goal of the law was to stop industrial espionage and trade secret theft, Iowa Code § 727.8A was not limited to criminalizing recording confidential business information.

22.     Further still, other legislators repeatedly acknowledged the true purpose of Iowa Code § 727.8A: to deter and punish the same investigations Iowa previously sought to repress with its other Ag-Gag laws. Senator Boulton explained he was supporting the bill to protect "farmers" and "meatpacking facilities." Senator Shipley also stated the bill was designed for the agriculture industry. Senator Bisignano stated something similar, emphasizing that Iowa Code § 727.8A's focus was on punishing "trespass for surveillance" of agricultural facilities—which he acknowledged, despite his support for the bill, was "a little overkill"—and stopping those "with the mental acuity to go after you personally for agriculture."

23.     Lest there be any doubt about § 727.8A's true function, one of the advocates for the bill was the Iowa Pork Producers Association. It encouraged the legislature to pass the statute to stop people with "hidden agendas and things like that" from being able to document how the Pork Producers' members raise the animals. Perry Beeman, *Senate Advances Bill Setting Penalties for Trespassers Who Photograph Animal Confinements*, Iowa Capital Dispatch (Mar. 30, 2021),

---

[2] The Iowa legislature does not make a transcript of proceedings available to the public. The quotes that appear in this Complaint are transcribed from the April 6, 2021 recording of proceedings in the Iowa Senate. That video can be found here: https://www.legis.iowa.gov/dashboard?view=video&chamber=S&clip=s20210406012724727&dt=2021-04-06&offset=27327&bill=HF%20775&status=r.

https://iowacapitaldispatch.com/2021/03/30/senate-advances-bill-setting-penalties-for-trespassers-who-photograph-animal-confinements/.

24.     The First Amendment protects against the State's unjustified attempts to suppress speech. Here, the State has created a special crime for engaging in speech without the slightest justification, and where the law's history suggests its only purpose is to continue Iowa's unlawful campaign to prevent the public from learning the truth about what occurs at animal facilities.

25.     Therefore, the law fails First Amendment scrutiny.

26.     Because the law restricts numerous speech activities beyond those of Plaintiffs, its legitimate applications (if any) do not counterbalance its unconstitutional ones, and thus it is also overbroad and violates the First Amendment. It is also overbroad because the State has failed to justify any of the law's speech restrictions.

27.     Therefore, Plaintiffs seek a declaration holding Iowa Code § 727.8A unconstitutional and an injunction preventing Defendants' enforcement of it.

## II.     JURISDICTION AND VENUE

28.     Because this case presents the question of whether Iowa Code § 727.8A violates the United States Constitution, the case arises under 42 U.S.C. §§ 1983 and 1988 as well as the Constitution itself, and this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

29.     Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 empower Plaintiffs to seek and this Court to enter the requested declaratory judgment.

30.     Federal Rule of Civil Procedure 65 and the Court's inherent equitable powers empower Plaintiffs to seek and this Court to enter the requested injunctive relief.

31.     Venue is proper in the Southern District of Iowa under 28 U.S.C. § 1391(b)(1) and (2). This is also where the prior two Ag-Gag cases were filed and heard.

### III.    PARTIES

32.    Plaintiff ANIMAL LEGAL DEFENSE FUND ("ALDF") is a national 501(c)(3) nonprofit animal protection organization founded in 1979 that uses education, public outreach, investigations, legislation, and litigation to protect the lives and advance the interests of animals, including those animals who are raised for food, used in biomedical research, exhibited to the public, or bred as pets. ALDF's work is supported by more than 300,000 members and supporters across the country, many of whom live in Iowa.

33.    Plaintiff PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS INC. ("PETA") is a Virginia non-stock corporation and animal protection charity exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code. PETA is dedicated to protecting animals from abuse, neglect, and cruelty, and undertakes these efforts through public education, employment-based investigations of facilities, newsgathering and investigative reporting, research, animal rescue, legislation, special events, celebrity involvement, and protest campaigns.

34.    Plaintiff BAILING OUT BENJI ("BOB") is a small Iowa-based nonprofit organization that works to protect companion animals and raise the public's awareness about various animal welfare issues impacting dogs. It is specifically concerned about animal mistreatment in puppy mills.

35.    Plaintiffs ALDF, PETA, and BOB all engage in investigations of animal facilities to further their missions and shape policy making and public discourse.

36.    Audio and video recording are part of ALDF's, PETA's, and BOB's investigations.

37.    Investigators sent on behalf of ALDF and PETA typically obtain employment at facilities that use animals in their business in order to observe and report on the treatment of the animals. Investigator-employees perform all assigned lawful tasks, while using a camera—that

does not interfere with any of their work—to document activities at the facility. They make recordings in areas they, other employees, and even employees of third parties (such as delivery drivers and service technicians) regularly have access to in order to fulfill their job functions. Investigators focus on recording conduct or conditions that potentially violate cruelty statutes or other laws, regulations, or standards, if any. ALDF's and PETA's recordings, potentially along with other appropriate documents such as complaints or witness statements, are then provided to law enforcement so that they can investigate and prosecute animal abusers as appropriate, to regulatory authorities for appropriate sanctions, and to the public via the media, the organization's own channels, and other organizations, among other uses in the organization's advocacy.

38.     ALDF and PETA have seen that the images and sounds these investigations capture are some of the most widely used, shared, and viewed aspects of their advocacy, making them an essential mechanism to inform and change how the public and government view and treat animals.

39.     ALDF and PETA have also relied on the data the recordings provide—such as time stamps and geospatial information automatically recorded on cameras as part of collecting images—to further develop evidence in regulatory comments, administrative complaints, requests for investigation and prosecution, petitions, and other activities, all of which are part of ALDF's and PETA's political and legal advocacy to improve the treatment of animals through increasing their protections.

40.     In addition to collecting the data described above as part of making a recording, PETA's investigator-employees may also use other electronic devices to record data that can be evidence of violations of law, such as the temperatures to which animals are exposed in the facilities. PETA uses this data in all the ways described above.

41.     BOB has its staff or volunteers go to puppy mills or pet stores as customers, and attend private puppy mill auctions, where dogs are sold for breeding, and record the activities they witness to document the mistreatment of these animals. It then uses these videos to further its public advocacy and push for reforms in the puppy mill industry, such as its efforts to highlight the U.S. Department of Agriculture's ("USDA's") inadequate enforcement of the Animal Welfare Act with respect to dogs in puppy mills.

42.     BOB has also seen that such videos are some of its most potent tools to educate the public, legislators, and the media about the harms of puppy mills. For example, when USDA redacted inspection reports of puppy mills and scaled back its enforcement of the federal Animal Welfare Act, BOB relied on its own and others' investigations to gather critically needed information about what dogs were enduring inside puppy mills and thereby advocate for increased inspections.

43.     ALDF, PETA, and BOB do not believe their investigators engage in trespass. However, Iowa has persistently attempted to criminalize their conduct, passing laws like Iowa Code § 727.8A and the two Ag-Gag laws a court has already held cannot be constitutionally enforced. Like Iowa's second Ag-Gag law, Iowa Code § 727.8A directly follows Plaintiffs' success in the courts, creating a new law whose elements include activities ALDF, PETA, and BOB explained they engage in to fulfill their missions. Moreover, the legislative history indicates the law was designed to be used against pro-animal investigators. Therefore, it is reasonable for ALDF, PETA, and BOB to believe the State will attempt to label their investigations a trespass and, as those investigations depend on recording activities, the investigator will be charged with violating Iowa Code § 727.8A. As a result, ALDF, PETA, and BOB are declining to pursue investigations in Iowa. In particular, PETA and ALDF have identified Cass, Dallas, and

Washington counties as counties with facilities to investigate, to which they will not send investigators because they fear the investigators will be charged under § 727.8A.

44.     In this manner, Iowa Code § 727.8A is chilling and suppressing ALDF's, PETA's and BOB's speech. Thereby, it is violating their First Amendment rights.

45.     Iowa Code § 727.8A also violates ALDF's, PETA's, and BOB's First Amendment rights by denying them access to information. Each of the organizations produces a variety of documents or media to publicize its positions and promote policies or laws to achieve its goals. In these materials, the organizations not only draw on their own investigations, but those of other groups who engage in similar activities and share recordings of their work publicly. Thus, because Iowa Code § 727.8A is chilling ALDF, PETA, and BOB and others from conducting investigations, it is preventing them from having access to other entities' recordings and violating ALDF's, PETA's, and BOB's First Amendment right to access information.

46.     Plaintiff FOOD & WATER WATCH ("FWW") is a 501(c)(3) nonprofit organization that fights for safe food, clean water, and a livable climate for all by standing up to the corporations and other destructive economic interests that put profits before people. FWW is a membership organization with more than 2.9 million members and supporters nationwide, including a supporter list of approximately 22,000 Iowans.

47.     FWW also maintains a presence in Iowa with organizing staff, as well as legal and communications support staff.

48.     Factory farming is one of FWW's priority issues, and FWW is engaged in numerous campaigns to hold the animal agriculture industry accountable for its adverse impacts on rural communities, consumers, animal welfare, and the environment. As part of this advocacy, FWW campaigns for improved transparency in the industrial livestock system and increased government

oversight of factory farms and their practices. FWW conducts this work through grassroots organizing, media outreach, public education, policy advocacy, research, and litigation. FWW has prioritized its anti-factory farm advocacy for at least ten years.

49.     As part of its work against factory farms, FWW relies on the recordings of organizations like ALDF and PETA. For example, FWW's Executive Director authored a book, *Foodopoly*, which was published. The book discusses an undercover investigation into a Hallmark/Westland slaughter facility conducted by a Humane Society of the United States ("HSUS") investigator who obtained employment at the facility to gain access to nonpublic areas and obtain videos showing inhumane treatment of cattle. FWW has promoted *Foodopoly* on its website. FWW relied on the same undercover investigation, as well as other undercover investigations by HSUS and Mercy for Animals, in an *amicus curiae* brief FWW filed in support of Plaintiffs-Appellees' challenge to Idaho's Ag-Gag law in 2016. FWW was lead plaintiff in a suit filed in 2019 against Pilgrim's Pride, alleging false and misleading advertising related to animal welfare. In its complaint, FWW relied on information gathered through employment-based undercover investigations by PETA and Compassion Over Killing. In Iowa, Food & Water Action—a 501(c)(4) organization affiliated with FWW that engages in similar types of advocacy—recently relied on videos and photos obtained through an undercover investigation by Direct Action Everywhere to support an ethics complaint against Iowa State Senator Ken Rozenboom. Senator Rozenboom's contract hog operations were the subject of the investigation, and he has played a leading role in championing previous Ag-Gag legislation in the State.

50.     FWW wishes to continue to similarly use and rely on information obtained from undercover investigations performed by advocacy groups like Plaintiffs PETA and ALDF in its advocacy.

51.     Therefore, by suppressing the speech of Plaintiffs and others, Iowa Code § 727.8A is denying FWW information to which it would otherwise have access and which it would use to further its own speech and advocacy.

52.     Therefore, § 727.8A violates FWW's First Amendment rights.

53.     Plaintiff IOWA CITIZENS FOR COMMUNITY IMPROVEMENT ("ICCI") is a statewide Iowa nonprofit, membership-based organization that works to enable Iowans from all walks of life—urban and rural, young and old, immigrant and lifelong Iowan—to make change in their communities by raising their voices and doing grassroots advocacy. ICCI's motto is "People Before Politics. People Before Profits. People Before Polluters." Its organizational priorities include fighting factory farms, protecting Iowa's clean water and environment, as well as advancing worker justice, racial justice, and immigrants' rights. Its members participate in its work and help direct its strategies, including electing the Board of Directors, which sets the organization's policies, provides organizational direction, and monitors the organization's activities.

54.     Among the tactics that ICCI uses to raise the profile of its issues and draw attention to its policy solutions is non-violent civil disobedience, particularly trespassing at political and corporate sites where the politicians or executives have refused to listen to those impacted by their actions. For instance, while participating in ICCI-organized non-violent civil disobedience, 31 members of ICCI were arrested for trespass for blocking a construction site that ICCI believed would be environmentally damaging to their community. Twelve members of ICCI were arrested for trespass while standing in the lobby of a Wells Fargo to participate in ICCI organized non-violent civil disobedience where they were protesting its predatory banking practices that contributed to the 2008-2009 financial crisis. ICCI's Executive Director was arrested for

trespassing while in areas of Senator Grassley's office open to other constituents, as part of the organization's protest against the Senator's support for Jeff Sessions to be U.S. Attorney General and the Senator's connected support for voter suppression. *See* Ben Hoppenworth, *Sessions Protesters Arrested at Grassley Des Moines Office*, KCRG-TV9 (Jan. 13, 2017), https://www.kcrg.com/content/news/Protesters-arrested-at-Grassley-Des-Moines-office-410706925.html.

55.     In each instance, while trespassing, ICCI recorded videos containing images and sound of its non-violent civil disobedience, so that its advocacy could be sent to the media and shared with its members and the public.

56.     Creating a moment that can be recorded is part of the reason ICCI engages in non-violent civil disobedience. ICCI has seen people react to both the images and sound and that increases the likelihood that its message will be shared and thereby attract people to its work and issues. Therefore, recording its non-violent civil disobedience is a particularly effective and important part of ICCI's advocacy.

57.     ICCI also records its non-violent civil disobedience so that it can send a record of its advocacy to officials in charge of the facilities. ICCI recognizes that workers at a site are likely not making the key decisions; ICCI stands in solidarity with them and seeks to protect their rights as well as those of other Iowans. It records its work to ensure the true decision makers are aware of ICCI's concerns and proposed solutions and will feel compelled to act.

58.     Further, ICCI records its non-violent civil disobedience with images and sound so that it can capture any violations of the law that its members might witness or experience while engaging in advocacy. Those recordings too can be shared with all of the entities described above and law enforcement.

59.     Put simply, Iowa Code § 727.8A directly targets the advocacy in which ICCI has engaged in the past.

60.     However, because violating Iowa Code § 727.8A is an aggravated misdemeanor, whereas trespass is only a simple misdemeanor, Iowa Code § 727.8A has a chilling effect on ICCI's advocacy.

61.     ICCI wishes to engage in and record its non-violent civil disobedience again so it can escalate and thereby draw more attention to its ongoing campaigns for climate justice, to protect democracy, to ensure an equitable farm and food system, to enforce healthcare as a human right, to demand every immigrant and refugee receive a fair paying job and a pathway to citizenship, and to dismantle the systems of racial oppression. It would record those trespasses like it has in the past. Consistent with its prior actions, it would record images and sounds of these activities to increase the impact of its message and identify any illegal conduct it witnesses, or it or its members suffer.

62.     However, ICCI is deterred from engaging in these activities because it does not want its staff or members to be charged with an aggravated misdemeanor. This is particularly true in connection with its ongoing campaign against factory farms, for which it has entered open business offices to protest in the past. It has contemplated engaging in similar activities in every Iowa county where factory farms are increasing and in Dallas County where it has ongoing campaigns against factory farms, Cass County where it has engaged in such campaigns in the past, and Washington County where factory farms are highly concentrated. However, because Iowa Code § 727.8A is aimed at such advocacy, ICCI believes its staff and members would be more likely to be charged under the law. Thus, it is less likely to engage in those activities, which expose ICCI's staff and members to the risk of the law's increased penalties.

63.     ICCI also has members who will not participate in any non-violent civil disobedience because they do not want to be charged with an aggravated misdemeanor. ICCI has seen that the number of people participating in its non-violent civil disobedience impacts the effect of its actions, both in terms of the attention the actions gather as they are ongoing and from the recordings. Therefore, as fewer members are willing to participate in ICCI's non-violent civil disobedience it is less likely to plan such actions.

64.     Put simply, Iowa Code § 727.8A chills and thereby suppresses ICCI and its members' speech, violating their First Amendment rights.

65.     Defendant KIM REYNOLDS is the Governor of Iowa and as such, is the Chief Executive for the State, responsible for ensuring the enforcement of the State's criminal statutes. The Governor is sued in her official capacity.

66.     Defendant TOM MILLER is the Attorney General of Iowa and as such, oversees the enforcement of the State's criminal statutes, including yearly coordination of training with Iowa County Attorneys who prosecute the state's criminal statutes in all of Iowa's 99 counties. Iowa Code § 13.2. The Attorney General is sued in his official capacity.

67.     Defendant VANESSA STRAZDAS is the County Attorney for Cass County Iowa, where Plaintiffs ALDF, PETA, and ICCI would consider engaging in activities prohibited by Iowa Code § 727.8A, but are deterred from doing so by the statute. As County Attorney, Vanessa Strazdas is responsible for enforcing State law and therefore would make the decision to charge ALDF's, PETA's, and/or ICCI's investigators, staff, and/or members under the statute. Iowa Code § 331.756. She is sued in her official capacity.

68.     Defendant CHUCK SINNARD is the County Attorney for Dallas County Iowa, where Plaintiffs ALDF, PETA, and ICCI would consider engaging in activities prohibited by Iowa

Code § 727.8A, but are deterred from doing so by the statute. As County Attorney, Chuck Sinnard is responsible for enforcing State law and therefore would make the decision to charge ALDF's, PETA's, and/or ICCI's investigators, staff, and/or members under the statute. Iowa Code § 331.756. He is sued in his official capacity.

69.     Defendant JOHN GISH is the County Attorney for Washington County Iowa, where Plaintiffs ALDF, PETA, and ICCI would consider engaging in activities prohibited by Iowa Code § 727.8A, but are deterred from doing so by the statute. As County Attorney, John Gish is responsible for enforcing State law and therefore would make the decision to charge ALDF's, PETA's, and/or ICCI's investigators, staff, and/or members under the statute. Iowa Code § 331.756. He is sued in his official capacity.

## IV.    ADDITIONAL FACTS

70.     Section 727.8A is codified in the Health, Safety, and Welfare section of the Iowa Code.

71.     It states in full: "A person committing a trespass as defined in section 716.7 who knowingly places or uses a camera or electronic surveillance device that transmits or records images or data while the device is on the trespassed property commits an aggravated misdemeanor for a first offense and a class D felony for a second or subsequent-offense."

72.     "Surveillance device" is not defined.

73.     "Data" is not defined.

74.     Nonetheless, by its plain meaning, data encompasses sound, time stamps, geospatial information and the like captured or generated as part of creating a video or photo, and other information, such as temperatures, that are recorded through an electronic device.

75.     The use of a camera or other device to record images, sound, or other data like that described in the paragraph above is speech.

76.     The act of recording is expressive, as it reveals what is of concern to the recorder.

77.     For instance, as part of one of ALDF's recent employment-based investigation into a pig breeding facility owned by The Maschhoffs LLC, the employee-investigator frequently returned to the same pigs. The images and time stamps allowed the employee-investigator to document the length of time the pigs went without food or went untreated for prolapsed rectums, intestinal ruptures, open wounds, and cysts. These choices by the employee-investigator demonstrate areas and facts of concern to ALDF and what it believes will move the public, which is a form of expression.

78.     The act of recording is also protected as speech because it is a predicate to expression.

79.     The showing of pictures or films or broadcasting speech can only occur if the activity or speech is first captured.

80.     ICCI could not engage with the media, advocate to corporations or its legislators, or communicate with its members in the same manners if it did not record its non-violent civil disobedience with images and sound.

81.     PETA could not as persuasively argue for stricter, more ethical temperature regulations and an end to abusive, criminal conduct occurring inside animal facilities if it was not able to document the present conditions and conduct. Regulators and law enforcement regularly demand evidence to support the need for rules and prosecutions, and PETA being able to supply that information moves regulators to act, prosecutors to charge perpetrators, and the public to demand change.

82.   ALDF could not produce its advocacy if it could not obtain footage that it relies on as evidence to support its claims and promote legal reforms and action, including as part of civil litigation.

83.   Therefore, the crime established by Iowa Code § 727.8A directly regulates speech.

84.   Nothing in the legislative history provides any factual rationale for this restriction.

85.   Nor does Iowa Code § 727.8A's plain language provide a rationale for the law.

86.   Iowa Code § 716.7, the provision cross-referenced as the first element of the new crime challenged here, is located in the code section for Damage and Trespass to Property.

87.   Section 716.7(2)(a) provides in full: "'Trespass' shall mean one or more of the following acts:

    i.   Entering upon or in property without the express permission of the owner, lessee, or person in lawful possession with the intent to commit a public offense, to use, remove therefrom, alter, damage, harass, or place thereon or therein anything animate or inanimate, or to hunt, fish or trap on or in the property, including the act of taking or attempting to take a deer, other than a farm deer as defined in section 170.1 or preserve whitetail as defined in section 484C.1, which is on or in the property by a person who is outside the property. This subparagraph does not prohibit the unarmed pursuit of game or fur-bearing animals by a person who lawfully injured or killed the game or fur-bearing animal which comes to rest on or escapes to the property of another.

    ii.   Entering or remaining upon or in property without justification after being notified or requested to abstain from entering or to remove or vacate therefrom by the owner, lessee, or person in lawful possession, or the agent or employee of the

owner, lessee, or person in lawful possession, or by any peace officer, magistrate, or public employee whose duty it is to supervise the use or maintenance of the property. A person has been notified or requested to abstain from entering or remaining upon or in property within the meaning of this subparagraph (2) if any of the following is applicable:

    a.  The person has been notified to abstain from entering or remaining upon or in property personally, either orally or in writing, including by a valid court order under chapter 236.

    b.  A printed or written notice forbidding such entry has been conspicuously posted or exhibited at the main entrance to the property or the forbidden part of the property.

iii.  Entering upon or in property for the purpose or with the effect of unduly interfering with the lawful use of the property by others.

iv.  Being upon or in property and wrongfully using, removing therefrom, altering, damaging, harassing, or placing thereon or therein anything animate or inanimate, without the implied or actual permission of the owner, lessee, or person in lawful possession.

v.  Entering or remaining upon or in railway property without lawful authority or without the consent of the railway corporation which owns, leases, or operates the railway property. This subparagraph does not apply to passage over a railroad right-of-way, other than a track, railroad roadbed, viaduct, bridge, trestle, or railroad yard, by an unarmed person if the person has not been notified or requested to

abstain from entering onto the right-of-way or to vacate the right-of-way and the passage over the right-of-way does not interfere with the operation of the railroad.

vi. Entering or remaining upon or in public utility property without lawful authority or without the consent of the public utility that owns, leases, or operates the public utility property. This subparagraph does not apply to passage over public utility right-of-way by a person if the person has not been notified or requested by posted signage or other means to abstain from entering onto the right-of-way or to vacate the right-of-way.

vii. Intentionally viewing, photographing, or filming another person through the window or any other aperture of a dwelling, without legitimate purpose, while present on the real property upon which the dwelling is located, or while placing on or retrieving from such property equipment to view, photograph, or film another person, if the person being viewed, photographed, or filmed has a reasonable expectation of privacy, and if the person being viewed, photographed, or filmed does not consent or cannot consent to being viewed, photographed, or filmed."

88.     Thus, Iowa Code § 727.8A is plainly not tailored to the offered rationale that it protects trade secrets. It covers entering into areas and making a recording whether or not an entity seeks to secure the area because it contains secrets.

89.     Indeed, due to the definition of trespass in Iowa law, § 727.8A criminalizes entering into areas and making a recording where the recording is capturing nothing that is private in any normal sense of the word.

90.     For instance, media who stay on property that is otherwise open to the public, after they have been asked to leave, and document important events, could be found to be trespassing

under Iowa law, and thus could be charged under Iowa Code § 727.8A if they also engage in still or video photography or simply use a handheld tape recorder or other audio recording device.

91.      Similarly, if ICCI were to return to the constituent areas of Senator Grassley's office, protest, and be asked to leave, its members could be charged under Iowa Code § 727.8A if they recorded those events like they do all of ICCI's other non-violent civil disobedience.

92.      A person who uses a cellphone camera to document physical or verbal abuse by other shoppers in a store with a "no photography" sign could be held to trespass under Iowa law, and now also would be charged with violating Iowa Code § 727.8A.

93.      Rail hobbyists who take photos of rail crossings are trespassing under Iowa law if they accidently cross onto rail property, and now they also would be violating Iowa Code § 727.8A.

94.      As a result, Iowa Code § 727.8A does not just target speech and is not just poorly crafted to meet its claimed ends, it encompasses an immense number of activities that have nothing to do with protecting business information, personal privacy, or private activities of any sort. As a result, it suppresses the work of the media and advocates, which are core First Amendment protected activities.

95.      Thus, in addition to failing First Amendment scrutiny, it is vastly overbroad: suppressing a huge volume of speech without truly serving any public purpose.

96.      For all of the above reasons, Iowa Code § 727.8A is unconstitutional.

## CLAIMS FOR RELIEF

### First Cause of Action
### First Amendment
### (Scrutiny)

97.      Plaintiffs incorporate by reference all other paragraphs of this complaint as if those

allegations were set out explicitly herein.

98.     Iowa Code § 727.8A fails First Amendment scrutiny because it is not a properly justified restriction on speech. As a result, it is facially invalid and should be struck down.

99.     Even if the Court were to determine the statute can survive facially, Iowa Code § 727.8A is at least unconstitutional as applied to Plaintiffs' planned activities. ICCI's desire to video its non-violent civil disobedience and use those recordings—including the data generated as part of those recordings—to shift policy is the height of First Amendment protected speech. Similarly, ALDF, PETA, and BOB make recordings to further their political advocacy, and ALDF, PETA, BOB, and FWW use the images and data generated as part of those recordings for the same ends. Iowa's special penalties for such speech are unconstitutional.

100.     Thus, Plaintiffs are entitled to a declaratory ruling that the Iowa Code § 727.8A is unconstitutional and an injunction preventing Defendants from enforcing it.

101.     In the alternative, Plaintiffs are entitled to a declaratory ruling that Iowa Code § 727.8A cannot be enforced against them and an injunction preventing Defendants from enforcing it against them.

102.     This will cure the law's chilling effect on Plaintiffs' speech and the First Amendment harm they are suffering from being denied access to information.

103.     Plaintiffs have no other adequate remedy at law.

**<u>Second Cause of Action</u>**
**First Amendment**
**(Overbreadth)**

104.     Plaintiffs incorporate by reference all other paragraphs of this complaint as if those allegations were set out explicitly herein.

105.     Iowa Code § 727.8A violates the First Amendment because it is overbroad. It

suppresses a substantial amount of protected speech compared to any legitimate sweep, although Plaintiffs contend Iowa Code § 727.8A lacks any legitimate sweep. It is also overbroad because it suppresses speech, and the State failed to justify that infringement on First Amendment rights.

106.     As a result, it is facially invalid and should be struck down, and Plaintiffs are entitled to a declaratory ruling that the Iowa Code § 727.8A is unconstitutional and an injunction preventing Defendants from enforcing it.

107.     This will cure the law's chilling effect on Plaintiffs' speech and the First Amendment harm they are suffering from being denied access to information.

108.     Plaintiffs have no other adequate remedy at law.

### REQUEST FOR RELIEF

Plaintiffs respectfully request an order and judgment:

1.     Declaring that Iowa Code § 727.8A violates the United States Constitution on its face and/or as applied to Plaintiffs;

2.     Permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing the law, or in the alternative, permanently enjoining Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing the law against Plaintiffs;

3.     Striking § 727.8A from the Iowa Code in its entirety and/or as-applied to Plaintiffs' activities;

4.     Requiring Defendants provide public notice, including in the official and online editions of the Iowa Code, that Iowa Code § 727.8A has been held unconstitutional and struck down, so as to ensure that the public has accurate notice of the requirements of the law and the

Iowa Code and to prevent chilling speech;

5.      Awarding the Plaintiffs reasonable attorneys' fees and costs; and

6.      Awarding any other such relief as the Court may deem just and proper.

August 10, 2021           Respectfully submitted,

                    */s/ Roxanne Conlin*
                    Roxanne Conlin AT0001642
                    Devin Kelly AT0011691
                    Roxanne Conlin & Associates, P.C.
                    3721 SW 61st Street, Suite C
                    Des Moines, Iowa 50321
                    (515) 283-1111
                    roxanne@roxanneconlinlaw.com,
                    dkelly@roxanneconlinlaw.com,
                    tadams@roxanneconlinlaw.com
                    cc: dpalmer@roxanneconlinlaw.com

                    David S. Muraskin*
                    Public Justice, P.C.
                    1620 L. St, NW, Suite 630
                    Washington, DC 20036
                    (202) 861-5245
                    dmuraskin@publicjustice.net
                    Counsel for Plaintiffs

                    Cristina Stella*
                    Kelsey Eberly*
                    Christine Ball-Blakely*
                    Animal Legal Defense Fund
                    525 East Cotati Avenue
                    Cotati, CA 94931
                    (707) 795-2533
                    cstella@aldf.org
                    keberly@aldf.org
                    Counsel for Animal Legal Defense Fund

Matthew Strugar*
Law Office of Matthew Strugar
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(323) 696-2299
matthew@matthewstrugar.com
Counsel for Animal Legal Defense Fund

Aaron Frazier*
Foundation to Support Animal Protection
(PETA Foundation)
501 Front Street
Norfolk, VA 23510
(757) 622-7382
AaronF@PetaF.org
Counsel for People for the Ethical Treatment
of Animals, Inc

Tyler Lobdell*
Food & Water Watch
1616 P Street NW, #300
Washington, D.C. 20036
(208) 209-3569
tlobdell@fwwatch.org
Counsel for Food & Water Watch

*Pending Pro Hac Vice Admission