IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| ANIMAL LEGAL DEFENSE FUND, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., BAILING OUT BENJI, FOOD & WATER WATCH, and IOWA CITIZENS FOR COMMUNITY IMPROVEMENT, | ) ) ) ) ) ) | Case No. 4:21-cv-00231-SMR-HCA |
| Plaintiffs, | ) ) ) | ORDER ON DEFENDANTS' MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| v. | ) ) | |
| KIMBERLY REYNOLDS, in her official capacity as Governor of Iowa, TOM MILLER, in his official capacity as Attorney General of Iowa, VANESSA STRAZDAS, in her official capacity as Cass County Attorney, CHUCK SINNARD, in his official capacity as Dallas County Attorney, and JOHN GISH, in his official capacity as Washington County Attorney, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs are five non-profit organizations dedicated to animal welfare, environmental protection, and other grassroots advocacy issues.  To gather information on animal abuse and other illegal conduct, they conduct investigations of the day-to-day activities at certain facilities at which they suspect wrongdoing occurs.  Plaintiffs represent that these investigations are conducted undercover and require the use of surreptitious video and photography to gather evidence which they present to legal authorities, elected officials, media organizations, and the general public.

Plaintiffs brought this action to challenge Iowa Code § 727.8A, which they argue infringes on their freedom of speech rights guaranteed by the First Amendment to the United States

Constitution.  They contend the law impermissibly restricts speech by making it a crime to place an electronic surveillance device on trespassed property.

Defendants are five state and county government officials sued in their official capacity. They are responsible for enforcing violations of § 727.8A.  Defendants assert the law does not regulate protected speech under the First Amendment.  They argue if the law does regulate speech, it is narrowly tailored to a significant governmental interest.

Two Motions are before the Court.  Defendants move to dismiss the Complaint in its entirety.  [ECF No. 16].  Plaintiffs move for summary judgment or, in the alternative, request a preliminary injunction enjoining enforcement of the law pending final judgment.  [ECF No. 23]. Both Motions have been extensively briefed by the parties and the Court finds a hearing is not necessary.  *See* LR 7(c).  For the reasons described below, Defendants' Motion to Dismiss is DENIED and Plaintiffs' Motion for Summary Judgment is GRANTED.  [ECF Nos. 16; 23].

## I.     INTRODUCTION

### A.  Background

Iowa Code Section 727.8A (the "Act") is the third in a series of laws passed by the Iowa Legislature intended to combat asserted harms flowing from undercover investigations conducted by activist organizations, such as the Plaintiffs, on certain facilities.  Those laws were previously challenged in the United States District Court for the Southern District of Iowa.  *See Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812 (S.D. Iowa 2019) (*Reynolds I*), *aff'd in part, rev'd in part*, 8 F.4th 781 (8th Cir. 2021) (*Reynolds II*); *Animal Legal Def. Fund v. Reynolds*, --- F. Supp. 3d ---, 2022 WL 777231 (S.D. Iowa Mar. 14, 2022) (*Reynolds III*), *appeal docketed* No. 22-1830 (8th Cir. Apr. 22, 2022).  The laws at issue in *Reynolds I* and *Reynolds III* have legally relevant distinctions from the Act in this case, so only a brief recap is necessary.

1. *Reynolds I* & *Reynolds II*

In *Reynolds I*, Senior United States District Court Judge James E. Gritzner granted a motion for summary judgment, finding the law at issue in that case, Iowa Code § 717A.3A, violated the First Amendment.  That law consisted of two provisions.  The first provision, known as the "Access Provision," prohibited a person from "[o]btaining access to an agricultural production facility by false pretenses."  *Reynolds I*, 353 F. Supp. 3d at 818 (quoting Iowa Code § 717A.3A). The second provision prohibited a person from "obtain[ing] access to an agricultural facility by false pretenses [or by] mak[ing] a false statement or representation as part of" an employment application.  *Id.*  This was later termed the "Employment Provision."  Judge Gritzner determined that the statute regulated protected speech, even though it only pertained to "falsehoods," based on the Supreme Court's holding in *United States v. Alvarez*, 567 U.S. 709 (2012).  *Id.* at 820–23. Specifically, he held the law was a content-based regulation because it required an official to examine the content of a statement to determine if it violated the law.  *Id.* at 822–23.  After examining whether the law survived strict scrutiny, Judge Gritzner concluded that the law failed on both narrow tailoring and compelling interests grounds and entered a permanent injunction.  *Id.* at 825–27.

On appeal, the United States Court of Appeals for the Eighth Circuit affirmed in part, and reversed in part.  The *Reynolds II* court found the "Access Provision," withstood First Amendment scrutiny.  *Reynolds II*, 8 F.4th at 786.  The panel held that trespass is a "legally cognizable harm" and therefore a falsehood which results in a trespass may be constitutionally proscribed.  *Id.* (relying on the plurality opinion in *Alvarez* for the proposition that "intentionally false speech undertaken to accomplish a legally cognizable harm may be proscribed without violating the First Amendment.").

However, the *Reynolds II* court affirmed Judge Gritzner on the "Employment Provision." *Id*. at 787.  They found it was constitutionally infirm because it did not limit liability to "false statements that are material to a hiring decision."  *Id*. at 787.  Positing that certain harmless and trivial falsehoods could fall under its purview, the Employment Provision was "too broad to satisfy the First Amendment."  *Id*.

### 2.   *Reynolds III*

In *Reynolds III*, this Court confronted a very similar law to the one in *Reynolds I* and *Reynolds II*.  The law prohibited accessing agricultural production facilities through "deception."  *Reynolds III*, 2022 WL 777231, at *5.  The statute further required that the deception be "on a matter that would reasonably result in a denial of access" to a targeted facility.  The deception must also be "with the intent to cause physical and economic harm" to the targeted facility.  *Id*. (quoting Iowa Code § 717A.3B(1)).

The Court found—consistent with Judge Gritzner's holding in *Reynolds I*—that the law was viewpoint-based, which is a subset of content-based regulation. *Id*. at *7–8.  The law regulated based on viewpoint because it imposed liability based on the intent of the speaker. *Id*. at *10–11.  Applying strict scrutiny, the Court concluded the law did not survive because it lacked sufficiently compelling interests and was not narrowly tailored. *Id*. at *12–13.

### B.   *Current Case*

### 1.   Iowa Code Section 727.8A

The relevant law in this case is Iowa Code § 727.8A.  It makes it a crime for "[a] person committing a trespass as defined in section 716.7[1] [to] knowingly place[] or use[] a camera or electronic surveillance device that transmits or records images or data while the device is on the

---

[1] Iowa Code section 716.7 is Iowa's general trespass law.

trespassed property[.]"  Iowa Code § 727.8A.  The first offense is an aggravated misdemeanor and a second or subsequent offense is a class "D" felony.  *Id.*

Iowa Code section 727.8A imposes significantly enhanced criminal sanctions compared with the general trespass law, which is generally a serious misdemeanor.  *See* Iowa Code § 716.8(1)–(3).  A serious misdemeanor is punishable by a fine of $400–$2,560 and no more than one year imprisonment, whereas an aggravated misdemeanor imposes a fine between $855–$8,540 and a maximum of two years' imprisonment.  Iowa Code § 903.1(1), (2).

### 2.   The Parties

#### a.   Plaintiffs

The Animal Legal Defense Fund ("ALDF") is a national nonprofit organization that educates the public on select issues through outreach, investigations, proposed legislation, and litigation.  [ECF No. 23-3 at 24] (Walden Decl.).  It emphasizes that undercover investigations are a key tool in the organization's efforts and it employs individuals to conduct them.  *Id.*  During the investigations, ALDF's investigators often make recordings in order to document the conditions in animal facilities.  *Id.* at 25.  It affirms that recordings captured during investigations are used in educational materials, media engagement, legislative advocacy, and lawsuits.  *Id.* at 26.  Some of these undercover investigations have been conducted in Iowa.  *Id.* at 24, 26.

People for the Ethical Treatment of Animals ("PETA") is an animal welfare charity whose activities are dedicated to protecting animals from abuse, neglect, and cruelty.  [ECF No. 23-3 at 33] (Kerr Decl.).  Its efforts are accomplished through public education, employment-based undercover investigations, investigative news gathering, research, and litigation.  *Id.*  PETA also engages in undercover investigations, the fruits of which it uses to promote public and governmental action.  *Id.* at 36.  Its undercover investigations often require surreptitiously

obtaining employment at a targeted facility to use a hidden camera to document the events that its investigators witness. *Id*. at 33–34. PETA has conducted such investigations at Iowa facilities previously. *Id*. at 34.

Bailing Out Benji ("BOB") is an Iowa-based nonprofit organization with the aim of providing information to the public about abusive, high-volume dog breeding operations, often described as "puppy mills." [ECF No. 23-3 at 40–41] (Callison Decl.). As a tactic of its work, BOB uses staff and volunteers to gain access to puppy mills, dog auctions, and pet stores while posing undercover. *Id*. at 41–42. These individuals will use hidden recording devices to document the conditions they witness, which are later used by BOB to further its mission of educating the public and lobbying for greater government oversight. *Id*. at 41–43. These investigations have been conducted all over the country, including in Iowa. *Id*. at 42–43.

Food & Water Watch ("FWW") is a national, nonprofit membership organization that seeks to address food, water, and climate issues. [ECF No. 23-3 at 50] (Merkel Decl.). The group's activities include lobbying about farming conditions in Iowa. *Id*. at 50–51. FWW states that it relies on information gathered by ALDF and PETA for its own advocacy efforts, including the images and videos produced by those organizations during undercover investigations. *Id*. at 51–53.

Iowa Citizens for Community Improvement ("ICCI") is an Iowa-based organization which engages in grassroots advocacy prioritizing farming conditions, clean water, environmental concerns, worker justice, racial justice, and immigrant rights. [ECF No. 23-3 at 3–4] (Whelan Decl.). One of ICCI's methods to advance its goals is engagement in non-violent civil disobedience including trespass. *Id*. at 5. Its members typically record their protests, capturing the protest participants and their chants, statements, and other activities. *Id*. at 6. ICCI states

recordings are integral to their work because they are then used to raise awareness of their issues and its message.  *Id*. at 6.

### b.   Defendants

Defendants are all government official charged with enforcement of criminal laws in the State of Iowa and their respective counties.  Kim Reynolds is the Governor of Iowa; Tom Miller is the Attorney General of Iowa; Vanessa Strazdas is the County Attorney for Cass County; Chuck Sinnard is the County Attorney for Dallas County; and John Gish is the County Attorney for Washington County.  They are all sued in their official capacity.

### c.   Procedural history

On August 10, 2021, Plaintiffs filed this suit asserting the Act violates the First Amendment and seeking a permanent injunction against its enforcement.  [ECF No. 1].  Defendants moved to dismiss the Complaint, arguing Plaintiffs lacked standing to sue; Plaintiffs' claims were not ripe; and the Act did not violate the First Amendment.  [ECF No. 16].  Plaintiffs filed a resistance to the Motion to Dismiss.  [ECF No. 25].  On the same day, Plaintiffs moved for summary judgment or, alternatively, a preliminary injunction.  [ECF No. 23].  Defendants resisted the Motion for Summary Judgment.  [ECF No. 34].

## II.   ANALYSIS

### A.  *Defendants' Motion to Dismiss*

Defendants filed a Motion to Dismiss the Complaint in its entirety, asserting the Court does not have subject-matter jurisdiction because Plaintiffs lack standing and their claims are not ripe. Furthermore, Defendants contend that the Complaint fails to state a claim for violation of the First Amendment as a matter of law and it should be dismissed on that basis as well.

1.   Motion to Dismiss Standard

To state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   On a Rule 12(b)(6) motion, a district court must accept as true all factual allegations in the light most favorable to the nonmoving party. *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014). But "the facts alleged in the complaint must be enough to raise a right of relief above the speculative level." *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009) (citation omitted). A court is not required to "accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

Plaintiffs' standing is challenged under Fed. R. Civ. P 12(b)(1).  *See Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013) ("If a litigant lacks Article III standing . . . then we have no subject matter jurisdiction over the suit."); *see also Disability Support All. v. Heartwood Enters.*, LLC, 885 F.3d 543, 547 (8th Cir. 2018).   Article III standing requires a plaintiff to establish: (1) an injury-in-fact; (2) a causal connection between the injury and the alleged unlawful conduct; and (3) likelihood that the injury will be redressed with a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).   The question of standing is a fundamental threshold issue for every federal action as it implicates the district court's subject-matter jurisdiction to consider a dispute.  *Faibisch v. Univ. of Minnesota*, 304 F.3d 797, 801 (8th Cir. 2002) ("[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction."). Standing doctrine limits the jurisdiction of the federal courts to "cases" and "controversies" that are "appropriately resolved through the judicial process."  *Lujan*, 504 U.S. at 560; *see also California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (noting the federal judicial power under

Article III requires litigants to have standing).  "The party invoking federal jurisdiction bears the burden of establishing standing."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (internal quotation and citation omitted).

The injury in fact requirement ensures "that the plaintiff has a 'personal stake in the outcome of the controversy.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  This requires proving harm that is "concrete" and "actual or imminent, not 'conjectural' or hypothetical.'"  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983)).  A plaintiff can establish such a harm "where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Driehaus*, 573 U.S. at 159 (citation omitted).  An actionable "chilling effect" under the First Amendment must be objectively reasonable.  *Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 792 (8th Cir. 2004).  However, a valid chilling effect does not require a plaintiff risk arrest or prosecution to challenge a statute that they claim deters the exercise of their constitutional rights.  *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

The purpose of the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Nat'l Right to Life Pol. Action Comm. v. Connor*, 323 F.3d 684, 692 (8th Cir. 2003) (citation omitted).  In determining whether a case is ripe, the Court considers the "'fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'"  *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (citation omitted). Generally, "[t]he touchstone of a ripeness

inquiry is whether the harm asserted has matured enough to warrant judicial intervention." *Id.* (citation omitted). The Eighth Circuit has held that "where a plaintiff alleges a chill on speech, 'Article III standing and ripeness issues boil down to the same question.'" *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 721 n. * (8th Cir. 2021) (quoting *Driehaus*, 573 U.S. at 157 n.5).

### 2. Motion to Dismiss Analysis

In its brief in support of the Motion to Dismiss, Defendants acknowledge that "Plaintiff ICCI may have suffered an injury by not being able to engage in trespass and record said trespass under Iowa's Trespass Surveillance statute, [but] a plaintiff must suffer an injury to a legally recognized interest." [ECF No. 19 at 9]. As Plaintiffs point out, this concession by Defendants establishes an injury-in-fact for standing purposes. [ECF No. 23-1 at 4]. It is also undisputed that Defendants are the individuals charged with enforcing the Act, *see* Iowa Code § § 13.2 (describing the duties of the Attorney General); 331.756 (County Attorneys), and Plaintiffs' requested relief— an injunction against enforcement of the Act—would redress Plaintiffs' alleged injury. Only one plaintiff "with standing is sufficient to satisfy Article III's case-or-controversy requirement," which means the Court may proceed to the merits of Plaintiffs' claims.[2] *Rumsfeld v. F. for Acad. & Inst'l Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

### B. Plaintiffs' Motion for Summary Judgment

### 1. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Paulino v.*

---

[2] The Court does, however, find that all Plaintiffs established an injury in fact, traceability, and redressability in both the Complaint, and the summary judgment record. Organizational standing requirements are similarly satisfied. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000).

*Chartis Claims, Inc.*, 774 F.3d 1161, 1163 (8th Cir. 2014).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) ("A fact is material if its resolution affects the outcome of the case.").  When considering a summary judgment motion, courts must draw all "justifiable inferences" in favor of the nonmoving party.  *Anderson*, 477 U.S. at 255.  On summary judgment, it is impermissible for a court to make credibility determinations or weigh evidence.  *Id*.

When the moving party bears the ultimate burden of proof, they must establish all essential elements of its claim to succeed.  *See Hammond v. Northland Counseling Ctr., Inc.*, 218 F.3d 886, 891 (8th Cir. 2000) (citation omitted).  To avoid entry of summary judgment, the non-moving party must identify the existence of a genuine issue of material fact through competent evidence.  *Zubrod v. Hoch*, 907 F.3d 568, 574–75 (8th Cir. 2018).  Competent evidence can include "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment."  *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1110 (8th Cir. 2007) (citation omitted).  The non-moving party must advance "probative evidence that would permit a finding in [the nonmoving party's] favor, without resort to 'speculation, conjecture, or fantasy.'"  *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009) (citations omitted).  Additionally, the nonmoving party must identify specific evidence in the record and describe why the evidence supports its claim.  *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 258 (8th Cir. 1996) (quoting *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986)).  If there are no issues of material fact in dispute to the extent that no reasonable juror could find for the nonmoving party, summary judgment should be entered. *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1018 (8th Cir. 2004) (citation omitted).

### 2.   First Amendment Analysis

Plaintiffs make two challenges to the Act.  First, they assert it is unconstitutional under the First Amendment of the United States Constitution.  Second, they maintain the Act is overbroad because it is unclear which conduct is prohibited under the law and which is permissible.  The Court provides a brief overview of each argument.

Plaintiffs assert the Act regulates protected activity under the First Amendment.  They further contend it fails to pass intermediate scrutiny.  Specifically, they maintain the Act does not survive intermediate scrutiny because it is overinclusive, underinclusive, and overbroad. Defendants respond that the Act regulates conduct and not protected speech, which means the First Amendment is inapplicable.  They also maintain that First Amendment rights are significantly limited on private property.  They claim that if the law implicates any speech, the Act passes intermediate scrutiny because it is narrowly tailored to significant governmental interests.

Furthermore, Plaintiffs also argue the Act is unconstitutionally overbroad because it has numerous unconstitutional applications in relation to those which are permissible under the First Amendment.  Defendants dispute that the Act proscribes a substantial amount of protected speech in relation to its plainly legitimate sweep.

### a.   Whether the Act regulates speech

### i.   Speech creation

The First Amendment prohibits laws "abridging the freedom of speech."  U.S. Const. amend. I.  States are bound by the First Amendment through the Fourteenth Amendment's Due

Process Clause.  *See Gitlow v. New York*, 268 U.S. 652, 666 (1925); *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940) ("The freedom of speech . . . [is] secured to all persons by the Fourteenth Amendment against abridgment by a state.").  The First Amendment only regulates "speech," but included within that definition is the creation of speech.  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011).

The Supreme Court has recognized that occasionally the exercise of one's free speech rights is a process which occurs at multiple stages.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010).  Because of this, "laws enacted to control or suppress speech may operate at different points in the speech process."  *Id.*  Effective protection of freedom of speech requires the First Amendment's protections be applied at different stages.  *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference.").  Any other rule would allow the government to "disaggregate" the speech production process and impermissibly regulate speech in an indirect manner.  *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010).

ii.  Video recording and picture taking

Motion pictures and videos are included within the First Amendment's ambit.  *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501–02 (1952).  In addition to the doctrine regarding the creation of speech, the Eighth Circuit has found that recording, production, editing, and publication of videos is protected speech.  *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 751 (8th Cir. 2019) (holding that a wedding videographer's First Amendment rights were implicated when providing wedding video services).  The *Lucero* court focused its holding on the entire process of videography, which consisted of "shoot[ing], assembl[ing], and edit[ing] the videos with the goal of expressing their own views about the sanctity of marriage."  *Id.* at 751.

Defendants argue the Act is not on all fours with *Lucero* because the panel observed that the wedding videos were not "simple recordings," that were "the product of planting a video camera at the end of the aisle and pressing record." *Id*. The critical analytical step in *Lucero*, according to Defendants, is that the wedding videos transformed into the speech of the videographers by way of the editing process. Because the Act does not prohibit or regulate the editing, publication, or distribution process in any way, Defendants argue that *Lucero* is inapposite.

This argument is unconvincing. The Act's prohibition on video recording, prevents the production of a "finished video[]," which in turn restricts protected speech. *Id.* at 752. The Eighth Circuit explained the videographers' finished product was protected expression because they exercised "editorial control and judgment, including making decisions about the footage and dialogue to include, the order in which to present content, and whether to set parts of the film to music." *Id*. at 751. These considerations are implicated in this case.

Each Plaintiff in this case affirmed the importance of videos and other electronic recording in their organization's work. *See* [ECF No. 23-3 at 6 (ICCI), 25 (ALDF), 33 (PETA), 42 (BOB), 51 (FWW)]. They all attest that the Act has negatively impacted their ability to engage in this component of speech creation. *Id*. at 54–55. Plaintiffs assert they are concerned the Act criminalizes their activities and have refrained from engaging in them as a result. *Id*. at 27, 38, 46.

### iii.  Defining whether conduct or speech is governed

A statute that regulates protected speech must meet First Amendment muster, whether or not it also regulates conduct. *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 602 (7th Cir. 2012) ("When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play."); *Bartnicki v. Vopper*, 200 F.3d 109, 121 (3d Cir. 1999) (rejecting the argument "that a statute that governs both pure speech and conduct merits less First

Amendment scrutiny than one that regulates speech alone."). The inquiry "is not whether trespassing is protected conduct," but whether the law contains other restrictions on conduct that also "qualif[y] as protected speech." *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021) (quoting *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1194–96 (10th Cir. 2017) (*W. Watersheds Project I*)).

Defendants are incorrect in their assertion that the conduct in which Plaintiffs seek to engage is a trespass that "symbolizes nothing" and receives no First Amendment protections. [ECF No. 19 at 15] (quoting *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1207–08 (9th Cir. 2018) (Bea, J., dissenting)). The act of recording through video and other electronic means is the initial step in the process of speech development recognized in *Lucero*. It is true that the Act does not prohibit the editing, publication, or distribution of recordings or photographs on trespassed property. But it restricts the capture of such recordings or photographs, rendering the remaining steps in the protected video production process impossible. The act of recording is a necessary predicate to produce this protected speech and is protected under the First Amendment. *See Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015) (noting that if the predicates of speech were not subject to the First Amendment, the government could move "upstream and dam the source" of the speech it wishes to regulate); *see also Anderson*, 621 F.3d at 1062.

This conclusion is consistent with Supreme Court precedent which has emphasized that First Amendment analysis applies when speech is implicated by a law even if the law "*generally* functions as a regulation of conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010) (emphasis in original). Thus, the Court finds that the Act regulates protected speech and accordingly implicates the First Amendment. The Court turns to examine the governing standard of review and whether the law survives the relevant analysis.

iv.  Speech regulation on private property

Defendants also argue that because the Act applies to speech on private property, the First Amendment's protections are significantly diminished in that context.  [ECF No. 19 at 20].  They argue the interests of the property owner override any First Amendment concerns if Plaintiffs are involved in an underlying criminal trespass.  Plaintiffs characterize Defendants' position as an assertion that the government may "freely criminalize speech on private property."  [ECF No. 25 at 25].  They argue the few times in which expressive activities fall entirely outside the scope of the First Amendment is based on "categories" of speech and not locations.  *Id*. (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992)).

Other courts have noted that exempting private property from any First Amendment review could result in the criminalization of core free speech, such as criticism of a politician.  *See Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1209 (D. Utah 2017) (observing "[i]f a person's First Amendment rights were extinguished the moment she stepped foot on private property, the State could, for example, criminalize any criticism of the Governor, or any discussion about the opposition party, or any talk of politics whatsoever, if done on private property.").  The Supreme Court has previously invalidated laws which regulate speech on private property.  In *Watchtower Bible & Track Society*, the Village of Stratton prohibited canvassers from "going in and upon private residential property for the purpose of promoting any cause," without a city-issued license. *Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 154 (2002) (internal quotations omitted).  Acknowledging the ordinance has some benefits, the Court nonetheless held it unduly burdened speech and was thus unconstitutional.  *Id*. at 165–66.

In *Western Watersheds Project I*, the United States Court of Appeals for the Tenth Circuit found First Amendment scrutiny was warranted for two laws that prohibited "enter[ing] private

land" for purposes related to "resource collection."  The court there determined that "collection of resource data constitutes the protected creation of speech."  *Id*. at 1195–96.  It also opined that although Wyoming's general trespass statute might have withstood a First Amendment challenge based on resource collection, the law at issue in that case applied "differential treatment of individuals who create speech."  *Id*. at 1197.  On remand, the district court held the provisions facially invalid, finding that it was immaterial whether the affected property was public or private and the "speech interest" was the same regardless of where it occurred.  *Western Watersheds Project v. Michael*, 353 F. Supp. 3d 1176, 1190 n.7 (D. Wyo. 2018) (*Watershed II*) (quoting *Herbert*, 263 F. Supp. 3d at 1208–09).

Defendants describe Plaintiffs' challenge to the Act as seeking First Amendment protection for trespass.  As the Tenth Circuit in *Kelly* described it, these are "two related but distinct concepts." 9 F.4th at 1238.  The first concept involves the "ability to exclude from [their] property someone who wishes to speak."  *Id*.  (quoting *Herbert*, 263 F. Supp. 3d at 1208)).  This is constitutionally permissible. The second concept, which is one of "great constitutional import," is "the government's ability to jail the person for that speech."  *Id.*  (quoting *Herbert*, 263 F. Supp. 3d at 1208)).  This is what the government cannot do.  Here, the Act creates criminal liability—enforced by the State of Iowa—based on an individual engaging in activity protected by the First Amendment.  *See People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F. Supp. 3d 547, 567 (M.D.N.C. 2020) (finding a law is subject to First Amendment scrutiny "where liability is triggered" by engaging in protected activity).

### b.   Scrutiny analysis

Plaintiffs argue that the Act cannot pass even intermediate scrutiny, and thus both parties focus their analysis on intermediate scrutiny based on Plaintiffs' assertion that the Act cannot pass

that constitutional inquiry. *See* [ECF Nos. 23-1 at 14–16; 34 at 19–22]. Therefore, the Court will analyze the Act pursuant to intermediate scrutiny.

Under intermediate scrutiny, a law must be "narrowly tailored to serve a significant governmental interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989). A narrowly tailored regulation must genuinely advance the state's interest without sweeping too broadly or failing to regulate "significant influences" on the state's interest. *Republican Party of Minn. v. White*, 416 F.3d 738, 752 (8th Cir. 2005) (citations omitted). To be narrowly tailored, it must not be possible to replace the law with another regulation "that could advance the interest as well with less infringement of speech." *Id*. If "a substantial portion of the burden on speech does not serve to advance" the government's goals, the law is over-inclusive and invalid. *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 122 n.* (1991). Likewise, an underinclusive law is one that does not regulate a significant amount of the activities that create the harms that the law is intended to remedy. *See 281 Care Comm. v. Arneson*, 766 F.3d 774, 787 (8th Cir. 2014). As part of the analysis, the government must also "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). This requires the government to provide evidence that it considered less restrictive methods prior to imposing the speech restriction. *Id*. at 495–96.

Defendants argue that the Act serves to protect private and public property from invasion via trespass. [ECF No. 34 at 19]. They also urge it is intended to protect proprietary information or trade secrets. [ECF No. 19 at 27–28]. Defendants claim the right to privacy is further enhanced by the restriction on recording on such property. *Id*. They cite two incidents involving trespass onto a farm where the trespasser recorded conditions of the animals on the property. *Id*. at 19

n. 4, 5.  Defendants contend the Act is narrowly tailored because it focuses solely on situations where an individual has already committed a trespass and is attempting to use a camera or electronic surveillance device on the trespassed property.  They analogize the Act to "peeping tom" laws and laws restricting fraud.  *Id*. at 22.

Plaintiffs' response to this argument is that the Act is over-inclusive and under-inclusive.[3] It is overinclusive, according to Plaintiffs, because property and privacy interests can be protected by prohibiting entry, invasion, theft, and other non-expressive activities without reaching speech. [ECF No. 37 at 6].  Examples offered by Plaintiffs of the over-inclusiveness of the law include reporters who access railroad tracks or public utilities to document an accident; people who use their phones to record incidents at private businesses; whistleblowers using electronics to show unsafe conditions or other employment misconduct; and railroad hobbyists taking photos of crossings while on the property of the railroad company.  [ECF No. 25 at 37–38].  Plaintiffs assert that Defendants' examples of the two instances of trespass at agricultural facilities is insufficient to justify the Act's restrictions.  Furthermore, they claim that the two incidents demonstrate the Act's lack of tailoring because it does not target only agricultural facilities, resulting in a fatal overinclusiveness.  Plaintiffs also state the Act is underinclusive because it only protects against theft accomplished by electronic surveillance but not addressing ways to steal trade secrets such as through manual recording of the secrets.  [ECF No. 25 at 35].

The Court agrees with Plaintiffs that the Act is insufficiently tailored compared to its burden on speech.  There is a dearth of evidence to support the stated purposes for the Act, despite the fact that the law regulates a constitutional right.  It is certainly true that property rights and

---

[3] The First Amendment does not impose an "underinclusiveness" limitation but "facial underinclusiveness . . . raises serious doubts about whether [the government] is serving the interest specified."  *The Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

privacy are important governmental interest but there is next to nothing in the record to allow the Court to find that the State narrowed the Act appropriately even though this burden rests on the state. *White*, 536 U.S. at 774–75. Furthermore, there are other laws currently in effect which cover many of the instances where use of a video camera or electronic surveillance would raise issues relating to privacy concerns. *See, e.g.,* Iowa Code § 709.21 (invasion of privacy); § 716.7(2)(a)(7) (peeping tom law). The "peeping tom" law in which Defendants cite as an example of an "over-inclusive" law under Plaintiffs' analysis is inapposite. That law requires "filming another person through the window or any other aperture of a dwelling . . . if the person being viewed, photographed, or filmed *has a reasonable expectation of privacy*." Iowa Code § 716.7(2)(a)(7) (emphasis added). There is no such limitation in the Act. The existence of these other laws beg the question what the Act was intended to accomplish beyond targeting the expressive activities of organization such as Plaintiffs. Although little discovery has occurred in this case, discovery would not uncover the State's own purposes for passing the Act given the complete lack of explanation for such conduct.

c. Facial or As-Applied Challenge

Defendants insist that the Act is facially valid if there is any scenario in which it can be constitutionally applied. This language derives from *United States v. Salerno*, 481 U.S. 739 (1987), where the Supreme Court stated that a facial constitutional challenge to a law requires the plaintiff to show "that no set of circumstances exists under which the [challenged law] would be valid." *Id*. at 745. Defendants describe a variety of contexts where the trespass and placing of an electronic surveillance device would not be protected by the First Amendment such as a burglary, at a medical clinic, or for purposes of business espionage. [ECF No. 34 at 18]. They claim that summary judgment should be denied as a result.

Plaintiffs respond that the *Salerno* standard sets forth the consequences of facial relief and not a separate test for a facial challenge. "[T]he distinction between facial and as-applied challenges" does not have "some automatic effect" which alters the standard a challenger must satisfy. *Citizens United*, 558 U.S. at 331. Rather, "it goes to the breadth of the remedy employed by the Court." *Id*. The Supreme Court has observed that the standard described in *Salerno* was dicta and not dispositive in later cases. *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court, including *Salerno* itself.").

A facial challenge serves to "vindicate not only [Plaintiffs'] own rights, but those of others who may also be adversely impacted by the statute in question." *Morales*, 527 U.S. at 55 n.22. The Supreme Court has admonished courts not to "speculate about 'hypothetical' or 'imaginary' cases," when applying a constitutional test to a statute. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

"*Salerno* is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016). In sum, the Court need only apply the intermediate scrutiny test to the Act to determine its validity. As the discussion above demonstrates, it does not pass intermediate scrutiny and is therefore invalid.

## III.    CONCLUSION

This Court observed in *Reynolds III* that states may properly determine certain facilities warrant additional legal protections. 2022 WL 777231, at *13 (noting it is the province of the legislature "to determine whether specific facilities . . . are entitled to special legal protections.").

However, the Act provides protection with respect to the exercise of a First Amendment right.  The United States Constitution does not allow such a singling out of the exercise of a constitutional right.  The decision to single out this conduct is most plainly shown by Defendants' description of the Act as "enhancing the penalty for conduct that is already prohibited by law."  That is the issue with the law—it is enhancing a criminal penalty based on the exercise of speech (or a predicate component of speech).  The law does not limit its reach to specific instances of using a camera, such as a peeping tom situation.  Rather, the Act only punishes a trespasser exercising a constitutional right.  Section 727.8A burdens the exercise of speech and Defendants have not proffered a sufficient justification for such a burden.

Defendants' Motion to Dismiss is DENIED.  [ECF No. 16].  Plaintiffs' Motion for Summary Judgment is GRANTED.  [ECF No. 23].  The parties shall file a proposed injunctive language within 30 days of this Order.

IT IS SO ORDERED.

Dated this 26th day of September, 2022.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT